# UNITED STATES DISTRICT COURT

### for the

# DISTRICT OF NEW HAMPSHIRE

**GEORGE LAMBERT**
**3 LYDSTON LANE**
**LITCHFIELD, NH 03502,**

      *Plaintiff,*

      **v.**

**AETNA, INC.**
**151 FARMINGTON AVENUE**
**HARTFORD, CT 06156,**

      *as fiduciary and administrator of the*
      *Trinet Group Plan,*

**HARTFORD FINANCIAL SERVICES**
**GROUP, INC.**
**1 HARTFORD PLAZA**
**HARTFORD, CT 06115,**

      *as administrator of the of the TriNet*
      *Group Plan,*

      **Defendants, jointly and severally.**
_____/

## COMPLAINT

Plaintiff George Lambert suffered a massive heart attack in 2013, resulting in physical and cognitive impairments. When Lambert filed valid disability claims under an ERISA group plan underwritten by Aetna, Aetna was contractually obligated to pay Lambert benefits as described by the terms and conditions of the Plan.

But Aetna was also the Plan's administrator. When Aetna realized Lambert's condition would never improve—and facing 20 years of continuing large payments—Aetna sought to enrich itself by disregarding the Plan's plain language, keeping Plan documents and case information away from Lambert, and systematically underpaying Lambert. All while quietly reclassifying Lambert's disability claim into something that Aetna could cram into one of the Plan's narrow exclusions—risking that Lambert would neither notice nor have the means to complain.

If it were not for federal ERISA preemption of state law claims, Aetna would be both civilly and arguably criminally liable under New Hampshire law for a violation of a litany of insurance, consumer protections statutes, and offenses which undermine the legitimacy of evidence and the judicial process. Nonetheless, as Plaintiff Lambert is constrained to the strict remedial scheme mandated by ERISA, Lambert brings this civil action.

## **THE PARTIES**

1. George Lambert is a 54 year-old married male, with three daughters, residing in Litchfield, New Hampshire.

2. The TriNet Group Plan (the "Plan") is a group plan governed by ERISA, i.e. 29 U.S.C. ch. 18 *et seq*.

3. Aetna, Inc. ("Aetna") is the underwriter, fiduciary, and joint administrator of the Plan. While Aetna sometimes calls itself "Aetna Life Insurance Company" (a tradename of a subsidiary of Aetna, Inc.), Aetna has consistently used a U.S. trademark registered to Aetna, Inc. in its written communications with Lambert and indicated to Lambert that payments would actually be received from Aetna, Inc.

4. Hartford Financial Services Group, Inc. ("Hartford") is a subsequent administrator of the Plan. Upon information and belief, at some time Aetna transferred some but not all of its Plan administration duties to Hartford.

5. Upon information and belief, Hartford is an agent of the final fiduciary, Aetna.

6. Aetna, as final fiduciary of the Plan, is responsible for all actions of Hartford under respondeat superior.

7. The exact relationship and division of duties between Aetna and Hartford cannot be described because Aetna has repeatedly failed to produce requested Plan documents to Lambert. As their conduct and shared employees present to Lambert, Aetna and Hartford act in concert as a single entity.

## JURISDICTION & VENUE

8. Subject matter jurisdiction is proper in this Court. This Court has federal question jurisdiction because this action arises under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. ch. 18 § 1001. 18 U.S.C. § 1331.

9. Personal jurisdiction is proper over the Defendants because the Defendants do business in this Court's district.

10. Venue is proper pursuant in this Court because a substantial part of the events that give rise to Lambert's claims arose this Court's district and the several breaches complained of in this complaint occurred in that same district. 29 U.S.C. § 1132(e)(2).

## FACTUAL BACKGROUND

### The Plaintiff

11. George Lambert never finished his first time of college. But, he nonetheless became adept at software development in the 1980s and 1990s.

12. In 1994, George Lambert was partial owner of and was employed by Goldenware Travel Technologies LLC ('GTT') as Vice-President of Software Engineering. But in 2011, GTT had a dispute among its equity owners. After litigation in the Hillsborough Superior Court, Flightlookup, Inc. ("Flightlookup") was formed to receive assets from GTT and continue business. Lambert received an approximate 17% stake in the new company.

13. Flightlookup contracted with TriNet Group, Inc ("TriNet") for HR management.

14. TriNet is a "professional employer organization", sometimes referred to as a "POE".

15. According to TriNet's agreement with Flightlookup, Lambert was an employee of TriNet for payroll purposes.

16. As part of Lambert's compensation package with Flightlookup and TriNet, TriNet maintained a group insurance policy for both short-term disability and long-term disabilities underwritten by Aetna insurance. The TriNet group insurance policy (the "Plan") is an ERISA plan.

17. Defendant Aetna is the insurance underwriter of the Plan. Aetna is also the claims administrator of the Plan. Upon information and belief, Aetna contracted part of its administrative duties to Hartford at some point after 2015.

### Relevant Plan & Compensation Information

18. Lambert cannot determine whether the Plan is a *Firestone* plan, because Aetna has repeatedly refused to provide a copy of the Plan to him.

19. In 2013, Lambert's pre-disability gross salary was $140,000 (approximately $11,666.67 per month before taxes).

20. In any period that benefits are payable, the amount of disability benefits were 50% of Lambert's salary. That sum is approximately $5,833.33 ("monthly benefit payment").

21. In 2013, Flightlookup paid an additional $1,000 to Lambert.

22. The compensation amount above is to be adjusted annually (but never more than a 10% increase) on January 1 of each year.

23. Upon information and belief, Aetna never adjusted Lambert's benefit payments actually paid according to the CPI.

24. The Plan contains two tests for disability: an original test, and a second test that becomes active after 24 months of receiving long-term disability benefits.

25. After 24 months of long-term disability benefits, the Plan provides the following test of disability:

> "After the first 24 months of your disability that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any **reasonable occupation** solely because of an illness, injury or disabling pregnancy-related condition." (emphasis added.)

26. The Plan defines "reasonable occupation" as follows:

> "any gainful activity:
>
> 1.  For which you are, or may reasonably become, fitted by education, training, or experience; and
>
> 2.  Which results in, or can be expected to result in, an income of more than 80% of your adjusted predisability earnings."

27. A work opportunity which Lambert is not cognitively capable of performing is not a "reasonable occupation" under the Plan.

28. A work opportunity which would not compensate Lambert at least $112,000 (before annual CPI adjustments) is not a "reasonable occupation" under the Plan.

29. Lambert's maximum benefits end date is September 30, 2035.

**Before the Heart Attacks Lambert Had
Pre-existing Mood Disorder Conditions**

30. A mood disorder, or affective disorder, is mental health or behavioral disorder characterized by a main feature of the disturbance of the person's mood.

31. For unknown years prior to the disabling injury described below, Lambert suffered from mood disorders, specifically, anxiety, depression, etc. Part of these treatments were related to two separate car accidents, approximately a year apart in 1988 and 1989, which fractured vertebrae in Lambert's neck.

32. However, Lambert had been receiving both treatment and therapy for his condition.

33. Until the dates alleged by AETNA, Lambert's mood disorders had never interfered or prevented him from obtaining or retaining employment.

34. By all other measures, Lambert had been very successful for a person. Before his heart attacks, Lambert had been employed by both Flightlookup and its predecessor, GTT, for several years prior without disruption.

### Lambert Suffers A Life-Altering Heart Attack

35. On or about October 6, 2013, Lambert suffered a myocardial infarction, commonly known as a heart attack. Blood flow to his heart was 100% restricted, requiring serious medical and surgical intervention.

36. Because of the heart attacks Lambert suffered, the ejection fraction of Lambert's heart dropped to as low as 20%. This means that on each heart beat, Lambert's heart was only pumping approximately 20% of the blood through his heart.

37. A healthy person's ejection fraction may range from 55-70%.

38. A person with an ejection fraction of 35% or lower is at serious risk for dangerous cardiac arrhythmia, heart failure, and death.

39. Reduced oxygen availability can increase the risk of tissue damage to other tissues and organs of the body.

### Heart-Attack Induced Cognitive Impairment

40. In addition to the physical impairments of a heart attack, cardiovascular disease (CVD) and heart failure can cause long-term cognitive impairment.

41. Cardiovascular injury is medically recognized by the American Heart Association and the Centers for Disease Control as a cause of long-term cognitive impairment.

42. A person with cognitive impairment (resulting from heart-attack) may suffer from chronic reduced functioning in memory, concentration, judgment, ability to communicate, or planning and decision-making.

43. Impairment of cognitive functions from reduced cardiovascular function is not medically or diagnostically characterized as a unique mood disorder.

### Lambert Claims Short-Term Benefits under the Plan

44. After cardiac surgery and with family assistance, Lambert filed a claim for Short-Term Disability benefits with the Plan's administrator, Aetna.

45. Aetna began paying benefits on only half of Lambert's salary, incorrectly claiming that Lambert's salary was $70,000, not $140,000 as Aetna's records showed.

46. Then, on March 4, 2014, Aetna denied Lambert's claim for Short Term Disability benefits claiming that no medical records supported Lambert's disability claim.

47. Aetna claimed it would need "significant and compelling findings" to approve benefits.

48. A few days later, AETNA notified Lambert that he would soon reach the end of any possible short-term disability benefits.

49. On April 22, 2014, Aetna was aware that Lambert's cardiologist wrote that Lambert was having trouble with concentration, and that Lambert should be kept in a low-stress role, and that **Lambert's ability to return to work would depend "on any resumption of Lambert's cognitive abilities."** (emphasis added.)

50. At this time, Lambert's ejection fraction was, by two different testing methods, estimated at only 22-30%. The more accurate testing method showed a lower amount.

51. Lambert's doctors wrote that they did not expect Lambert's cardiac function to significantly improve.

52. On June 27, 2014, Aetna decided that Lambert was "totally disabled" from performing the duties of his own occupation due to cardiovascular injury.

53. With over 20 years of claims remaining to be paid, Aetna began looking for a way to triage Lambert's claim for termination.

**Lambert Claims Long-Term Disability Benefits**

54. On November 11, 2014, Aetna terminated Lambert's disability benefits without prior notice or warning.

55. In Aetna's first denial letter, Aetna announced that a significant reasons for termination was that Aetna had been surveilling Gary Lambert, and Aetna's agents had observed Gary Lambert conduct his congressional campaign with no apparent physical impairments.

56. George Lambert filed a written appeal with Aetna. One of Plaintiff George Lambert's primary appeal points was that George Lambert was not congressional candidate Gary Lambert.

57. On May 28, 2015, Aetna notified Lambert that Lambert would be notified of an appeal determination by July 5, 2015.

58. Aetna pushed the date back to August 3, 2015. Then, pushed back to September 7, 2015. Then, pushed back to October 20, 2015.

59. Each time Aetna stated that it was waiting for more documents. Lambert replied to Aetna that there were no additional documents to provide that were not already provided.

60. Nonetheless, Aetna withheld all properly due benefits through the end of 2015.

61. Lambert informed Aetna that the withholding of benefit payments had forced Lambert to sell a car, stocks, gold coins, and bitcoin to raise money so that Lambert's home would not be foreclosed on by his bank.

62. To avoid home foreclosure throughout 2015, Lambert sold approximately 57 bitcoins for a then-market rate of approximately $240 each.

63. Finally, in a letter dated January 11, 2016, Aetna overturned its decision to terminate Lambert's long-term disability claim.

64. In that reinstatement letter, Aetna decided there was indeed "sufficient medical evidence to support a functional impairment that would have prevented [Lambert] from performing the material duties of [Lambert's] own occupation."

65. Further, Aetna—despite its previous finding of total disability—determined that Lambert now had only part-time work capacity. Specifically noted, Aetna described Lambert's work impairment as functional and not physical.

66. At this time, Aetna noted that Lambert was restricted by one of Lambert's medical providers for not more than four hours of work per day due to Lambert's severely depressed ejection fraction and cardiomyopathy that was not expected to improve.

67. Aetna noted that Lambert's doctor's stated that if Lambert exceeded this work restriction, it could result in another heart attack, congestive heart failure, syncope, arrhythmias, or even sudden cardiac death.

68. On April 12, 2017 (and at Aetna's request), Lambert's primary care physician, Dr. Cohen advised Aetna that Lambert would be unable to work due to his multiple medical conditions, including Lambert's new pacemaker placement, and that Lambert would be disabled and recommended long-term disability status.

### Aetna Reinstates Long-term Disability Benefits & the Test of Disability Changes

69. Shortly after reinstating Lambert's benefits, Lambert had been eligible for long-term disability benefits for 24-months.

70. At that time, the Plan applied a new test of disability to Lambert.

71. Under the new test of disability: "Lambert would meet the Plan's test of disability on any day he was unable to work at any reasonable occupation solely because of an illness [or] injury. . . ."

72. However, this new test of disability came with a proviso: that if disability benefits were "solely for a mood disorder", then benefits could be terminated after 24 months.

73. Internally, on July 8, 2016, Aetna noted that Lambert's original claim was due to a "medical condition of an alteration in cardiovascular status with side effects of … [heart attack]."

74. After discussing Lambert's "claim direction", Aetna's behavioral health unit newly noted that "there was now a question of behavioral health condition of Mood Disturbances and Bipolar Disorder."

75. However, at no time did Lambert file a new disability claim for any of the above conditions nor assert that his condition was based solely upon any such "mood disorder."

76. Four days later, Aetna's behavioral health unit internally noted—without ever communicating to Lambert or Lambert's medical providers—that to support any claim for inability to do Lambert's core elements of his any occupation from a psychological perspective, Lambert's medical providers would need to produce evidence of recent examination findings showing impairment for mood disturbances.

77. Aetna's behavioral health unit listed various findings that would support such a claim.

78. Several of those symptoms and diagnoses are scattered throughout Lambert's medical files.

79. On February 27, 2017, Aetna arranged to complete a vocational rehabilitation assessment on March 15, 2017.

80. At no time prior to this, did Aetna receive any information that Lambert's functional impairment had changed or that Lambert's medical condition had improved.

81. On the contrary, Lambert's medical providers had previously and consistently noted that no significant improvement in Lambert's physical condition were anticipated. (And unfortunately, that it may deteriorate or be fatal.)

82. On May 11, 2017, Aetna internally noted that the "mood disorder" described by Dr. Tsvirko could be a deteriorating condition "secondary to Lambert's underlying medical condition."

83. However, on May 19, 2017, an Aetna committee internally decided—without any stated reason or rationale—that Aetna did "not find support for any physical impairment preventing [return to work] in [Lambert's own occupation]."

84. Indeed, Aetna employee Aetna Senior Claims Specialist Bryan Flynn personally telephoned Lambert to inform him of Aetna's decision:

> "Based on info currently in file [Aetna] does not feel Lambert is disabled from performing full time sedentary occupations based on a physical condition. The LTD policy has a 24 month limit on disabilities due to a mental health condition."

85. Flynn noted that Lambert expressed disagreement on that phone call.

86. Less than two weeks later, June 1, 2017, Aetna internally noted that Lambert lacked medical stability and that Lambert was not a candidate for rehabilitation.

**Aetna Shifts Away from Lambert's Medical Condition and
Focus on Lambert's Pre-Existing Conditions**

87. Until this time, Aetna's internal notes variously provide that Lambert was out of work "due to [coronary artery disease], [congestive heart failure] disease, type 2 diabetes, ejection fraction reported 30-35% with side effects of **fatigue, cognitive issues.**" (emphasis added).

88. Aetna further noted that Lambert was "being treated for mood disturbance and anxiety".

89. AETNA noted that Lambert had tried to work for a different company, but his agreement was not renewed, and there was no effect on his LTD benefit payment.

90. Internally, Aetna decided from a *physical standpoint* that Lambert could work in his own occupation. That is, Aetna considered whether Lambert could physically sit at a desk and work as a software engineer or manager.

91. But Aetna did not consider whether the physical disability of having chronically inadequate oxygen to his brain would affect Lambert's ability to perform a reasonable occupation from a cognitive standpoint.

92. Instead on April 25, 2017, Aetna internally decided that a behavioral health unit should review the disability claim from a behavioral health standpoint.

93. More specifically, Aetna sought to separate any connection between (1) Lambert's underlying medical condition which he claimed disability for, and (2) Lambert's cognitive functioning, which Aetna was exclusively classifying as other mood disorders.

94. Aetna decided that even if the behavioral health unit supported Lambert's disability, then Aetna should surveil Lambert again. Aetna's goal in surveilling the claimant would be to deny benefits a fourth time to a claimant that its own behavioral health unit had just found were supportable.

95. On July 24, 2017, Aetna contacted Lambert's doctor, Dr. Tsvirko, for information concerning Lambert's status.

96. In response, Dr. Tsvirko replied that Lambert's functional impairments were not psychological in nature, but likely related to his cardiac conditions.

97. Dr. Tsvirko noted to Aetna that Lambert's activities of trying to be more active—i.e. retrain skills, securing new employment, keeping a job, doing some volunteer work—continued to meet with failure.

98. Dr. Tsvirko noted that each attempt noted by Aetna as evidence of work capability, often reference to the actual outcome, and that Aetna's treatment of Lambert was injurious to her patient and disappointing.

99. On September 15, 2017, Aetna refused to provide a copy of Lambert's Plan documents upon Lambert's request.

100.    On October 10, 2017 Aetna was still aware that Lambert suffered from fatigue and

cognitive issues. At that time, Aetna decided to proceed with a psychological independent

medical examination by Dr. Elisabeth Moes.

101.    Dr. Moes conducted a full-day, in-person medical assessment of Lambert.

102.    Dr. Moes medical opinion was that Lambert was unable to sustain a concerted effort

such as a 40-hour work week. Dr. Moes noted Lambert had a "slowed processing speed"

and that Lambert's cognitive functioning was merely in the average range.

103.    Dr. Moes opined that Lambert could work part-time, perhaps gradually up to three

days of a work week. Possibly, and in accordance with Lambert's demonstrated work

performance or non-performance, Lambert's work time might be scaled up or down.

104.    Dr. Moes further noted that Brian Flynn, an Aetna claims specialist, had specifically

requested that Dr. Moes "provide [her] responses solely as it pertains to [Lambert's]

behavioral health status."

105.    Dr. Moes replied that Aetna's request to focus solely on Lambert's behavioral health

status was not possible or ethical.

106.    Dr. Moes notified Aetna that, "it is not possible to consider a person's cognitive

abilities outside of factors such as fatigue, which may result from cardiac and/or other

issues."

107.    However, Dr. Moes further reported that Aetna had omitted Lambert's physical health

information from the medical records Aetna transmitted to her.

108.    Dr. Moes nonetheless noted Lambert's fatigue and potentially cardiac status had been

documented and should be taken into account as a limitation on Lambert's as a limitation

in his return to work.

109.    Ultimately, Dr. Moes opined that Lambert was capable of limited periods of several

hours to a couple days. And provided a stepped protocol for increasing or decreasing

Lambert's workload.

110.    Dr. Moes specifically identified consultation work as best suited for Lambert as it

would not require consistent effort on a daily basis.

**Final Denial**

111.    Despite Dr. Moe's report, Aetna concluded—offering no particular reason or

rationale—that Dr. Moes' independent medical examination supported Aetna's internal

decision that Lambert's claim was based "solely on a mood disorder."

112.    Given the lack of a basis for its decision, the cherrypicking of adverse information

and selective suppression of adverse information to Aetna as an underwriter (even as

Lambert's physicians cautioned that it may kill Lambert), Aetna's decision that Lambert

could work in his own occupation for a 40-hour work-week was made in an arbitrary and

capricious manner.

113.    At the same time, Aetna explicitly refused to provide any further information (or

copies of the report) to Lambert or Lambert's doctors. Instead, Aetna stated that it was

"their policy" not to provide any information until an adverse benefits decision were

made. Lambert had to obtain Dr. Moes written documentation from Lambert's own

doctors, who requested it from Dr. Moes's office directly.

114.    On February 27, 2019, Lambert continued to report memory and cognitive issues.

115.    On April 2, 2019—buried in 6-point font—Aetna slyly asserted that Lambert's

disability claim was the only claim being considered by Aetna as the basis of his

disability claim.

116.    In fact, Lambert had never made such a mood disorder claim to Aetna.

117.    Aetna continued to provide long-term disability benefits until May 15, 2019.

118.    On May 15, 2019, Aetna claimed that Lambert's long-term benefits were terminated because he was being treated "solely for a mood disorder" and that Lambert had reached the 24-month maximum benefits for mood disorders.

119.    Aetna's unilateral decision to characterize Lambert's condition as solely a mood disorder appears arbitrary and capricious—but it was intentional and strategic. Aetna was merely executing a well-worn strategy, shoe-horning Lambert's claim arising from a heart attack and cardiovascular injury into the Plan's narrow, 24-month "mood disorder" exclusion which the Plan permitted.

120.    Even after this adverse decision, Aetna did not provide any further results of the independent examination by Dr. Moes which Aetna ostensibly used (but more likely ignored) to interpret Lambert's claim for benefits as subject to the mood disorder 24-month limitation.

121.    Dr. Moes' letters and notes only appear in Aetna's records disclosed to Lambert because Lambert obtained Dr. Moes' material indirectly and then submitted them directly to Aetna.

122.    At approximately the same time of the denial in 2019, Lambert learned that Aetna had mischaracterized his disability payments from Aetna as taxable personal income, when (as a co-owner for Flightlookup contributing to the purchase of the group plan), the insurance proceeds should have been tax-free.

123.    On November 14, 2019, Lambert timely filed a written appeal of Aetna's denial of benefits, and of the underpayment, tax treatment, and the forced sale of his property.

Lambert noted that Aetna was unlawfully withholding records and that his set of complaints may be later enlarged.

124. During the pendency of the appeal, Aetna contacted Dr. Mark Sims, concerning Lambert's case.

125. Dr. Sims did not examine Lambert and never contacted Lambert. At no time has Aetna disclosed any adverse report or notes by Dr. Sims during the pendency of Lambert's appeal.

126. Aetna disclosed Dr. Sims' adverse findings in Aetna's final rejection of Lambert's written appeal, giving Lambert no meaningful opportunity to address the limitations.

127. It is completely unknown to Lambert what Dr. Sims reviewed or did not review.

128. Aetna reports that Dr. Sims "did not find support for impaired cognition related to your cardiovascular condition."

129. Further, Aetna reported that Dr. Sims recommended that Lambert could perform a full 8 hour, 40 day work-week, without some restrictions and limitations.

130. However, there is no report or notes provided to Lambert that Dr. Sims made any consideration of cognitive impairment, nor by what means Dr. Sims determined there was no relation between Lambert's cardiovascular condition and Lambert's subsequent impaired cognition, or by what rationale.

131. The limited information disclosed to Lambert suggests that Dr. Sim's did not consider the issue of cognitive impairment. Unlike the written request to Dr. Moes to avoid looking at part of Lambert's records, Aetna's request to Dr. Sims is conspicuously absent. Instead, a few brief notes appear in Aetna's claim files.

132.   Going further, Aetna reported to Lambert—without directly attributing the statement to Dr. Sims—that Lambert's cardiologist's notes from December 13, 2019 "endorsed no cognitive impairment."

133.   Though in fact, the December 13, 2019 note from Lambert's cardiologist succinctly notes there is no change in Lambert's prognosis. Lambert's consistent, previous prognosis included well documented cognitive impairment.

134.   Aetna represented to Lambert it would supply a copy of Dr. Sims' full report to Lambert. But Aetna did not do so and continues to refuse to do so.

135.   On April 8, 2020, Lambert received a letter from Aetna dated April 6, 2022, that he had until April 6, 2023 to bring an action to appeal AETNA's decision.

## COUNT I: CIVIL CONSPIRACY, BETWEEN AETNA AND HARTFORD

136.   All prior paragraphs are incorporated into this count.

137.   Aetna appears to be the final fiduciary of the Plan, though it has also acted directly as the Plan administrator during part of the events in this Complaint.

138.   These dual functions by Aetna raise natural conflict of interest questions.

139.   However, at some unknown time, it appears that Aetna contracted with Hartford to exercise some of the administrator functions to the Plan, to provide the appearance of non-conflicted separation of fiduciary duties and professional discretion.

140.   However, Aetna retains primary control of the Plan's administrative decisions.

141.   The dates that Hartford began exercising administrative functions went into effect, and the names of individuals acting under each entity (as the same employers appear acting under both entities) cannot readily be determined by Lambert, as Aetna (or Hartford) have consistently impeded sharing Plan information with Lambert.

142.    From Lambert's position, there is no functional difference between Aetna and Hartford. Aetna as underwriter and administrator, is nonetheless responsible for Hartford's conduct both as a fiduciary and under respondeat superior.

143.    WHEREFORE, for the purposes of this civil action, Aetna's conduct is synonymous with Hartford's conduct, and Aetna is answerable for the actions of Hartford in administering the Plan.

## COUNT II:
## WRONGFULLY DENIED DISABILITY BENEFITS - BACK PAY
## Under ERISA § 503(a)(1)(B)

144.    All prior paragraphs are incorporated into this count.

145.    Lambert properly made claims for benefits, but over a period of years, Aetna cycled between repeatedly denying and approving Lambert's claims for disability benefits, for entirely different and sometimes contradictory reasons.

146.    In 2019, Aetna excluded Lambert's claim from long-term disability cover under the Plan, under a theory that Lambert's disability claim was solely for a mood disorder and not the underlying medical condition that Lambert actually claimed.

147.    In supporting its decision, Aetna considered only whether Lambert could perform the minimal, physical requirements of a sedentary (but high-level) executive job.

148.    However, Aetna made minimal attempts to evaluate Lambert's functional, cognitive capacities to perform each job and whether he could perform those jobs.

149.    On at least one occasion, where Aetna retained its own medical provider who provided evidence that Lambert was suffering from cognitive impairment, that it could be related to his cardiovascular condition, and that Lambert was unable to engage in full-time work.

150.    To that end, Aetna's application of the test for disability was arbitrary and capricious, and failed to account for the specific facts of Lambert's claim—facts which Aetna had knowledge of, but chose to ignore in order to self-enrich Aetna as the Plan underwriter.

151.    More specifically, Aetna knew that Lambert made a claim for cardiovascular injury. But Aetna, on its own initiative, reclassified Lambert's claim into being exclusively a "mood disorder" claim. Then, used Aetna's internal misclassification of Lambert's claim to deny Lambert long-term disability benefits under what Lambert had actually claimed.

152.    Aetna's wrongful denial of benefits has caused significant contractual disability benefits to go unpaid, causing significant financial injury to Lambert.

153.    WHEREFORE, Aetna is liable to Lambert for back benefits under the Plan in the approximate sum of $303,333, exclusive of applicable interest and CPI adjustments.

## COUNT III:
## WRONGFULLY DENIED DISABILITY BENEFITS - UNDERPAYMENT
### Under ERISA § 503(a)(1)(B)

154.    All prior paragraphs are incorporated into this count.

155.    In addition to the back payments of Count I, Aetna had underpaid Lambert's benefits in a variety of ways.

156.    Lambert's Base Annual Earnings were "twelve times the regularly monthly rate of pay on May 1st of each year plus bonuses and commission paid. . . ."

157.    On May 1, 2013, twelve times Lambert's regularly monthly salary was $140,000 plus an additional bonus of $1,000.

158.    For the calculation of disability benefits, Lambert's Base Salary was:

       i.    Lambert's annual salary; plus

  ii. Any bonus(s) or commissions paid through TriNet's payroll over the previous 12 months.

159. At the time of the disabling injury, Lambert's total Base Salary was $141,000.

160. But instead of applying the actual language of the Plan, Aetna substituted the amount of Lambert's annual salary that was then-processed via payroll services, totalling $113,749.98.

161. While also ignoring the definition of the base salary, Aetna also ignored the extra $1,000 that was processed through TriNet payroll.

162. Consequently, Aetna systematically underpaid benefits to Lambert by approximately 19%. In gross dollar terms, that is an approximate underpayment of $1,093.75 per month, exclusive of contractual inflation adjustments.

163. WHEREFORE, Aetna is liable to Lambert for under payment of benefits, in an amount not less than $48,125, not including interest and CPI adjustments.

### COUNT IV:
### WRONGFULLY DENIED DISABILITY BENEFITS - FRONT PAY
### Under ERISA § 503(a)(3)

164. All prior paragraphs are incorporated into this count.

165. Lambert properly made a claim for benefits.

166. Lambert's claims for benefits were properly payable.

167. From the beginning, Lambert's medical providers noted that Lambert's ability to perform his occupation (or impliedly, any reasonable occupation under the Plan) were subject to the resumption of his cognitive abilities to pre-disability levels.

168. Aetna terminated Lambert's claim in May 2019.

169.    Because Lambert's condition is not expected to significantly improve, Lambert is

reasonably anticipated to remain eligible for contractual benefits under the Plan through

September 30, 2035 or his premature death.

170.    Further, where Aetna has breached its fiduciary duties to Lambert and terminated his

benefits claims several times, it would be fruitless and inappropriate to order

reinstatement of benefits only to have Aetna deny Lambert's disability claim for a fifth

time, again when no longer subject to this Court's supervision in a civil action.

171.    While Aetna's obligations as an underwriter are contractual, demonstrated, repeated

breach of its contractual obligations gives rise to an equitable remedy of the constructive

acceleration benefits.

172.    An award of front will more fully and adequately compensate Lambert for his injuries

and discourage Aetna's future rascality in executing its duties under the Plan.

173.    WHEREFORE, Aetna should be held liable for front payment of benefits, in an

amount not less than $846,000, not inclusive of interest and CPI adjustments.

## COUNT V:
## FAILURE TO PROVIDE PLAN DOCUMENTS,
## Under ERISA § 502(a)(1)(A)

174.    All prior paragraphs are incorporated into this count.

175.    29 U.S.C. § 1024(b)(4) requires a Plan administrator to furnish a copy of certain Plan

information upon written request by a Plan participant or beneficiary.

176.    Lambert was entitled under ERISA to receive certain Plan documents automatically,

which Aetna did not provide.

177.    Further, Lambert requested a copy of Plan documents, including the Summary Plan

Description, on September 15, 2017 and at various times after.

178.   Aetna stated to Lambert that it was Aetna's policy to not share information on pending claims.

179.   After 30 days, Aetna had still failed to provide the requested information to Lambert.

180.   Aetna did not produce the requested information until 838 days later.

181.   The statutory violation amount is up to $110 per day that Aetna refused to produce Plan information to Lambert.

182.   WHEREFORE, Aetna is liable to Lambert for up to the sum of $92,180 in statutory penalties.

### COUNT VI:
### EQUITABLE RESTITUTION - FORCED SALE OF PROPERTY
### Under ERISA § 503(a)(3)
### (Made-Whole Relief)

183.   All prior paragraphs are incorporated into this count.

184.   As a consequence of Aetna's failure to pay benefits Aetna fully admitted were properly payable, Lambert suffered investment losses and lost opportunities because Lambert was forced to liquidate personal and investment property in order to pay basic living expenses and avoid home foreclosure.

185.   While Aetna was withholding benefits which Lambert was entitled to receive and Aetna paid over a year late, Lambert was instead compelled to sell 57.04251575 Bitcoins for a sum of approximately $13,366.20.

186.   As a measure of his lost opportunity, Lambert's holdings would be worth approximately $1,607,000 today.

187.   It would be entirely inequitable to allow a dual-function Plan underwriter and administrator such as Aetna to withhold Plan benefits for their own benefit and profit, while coercing disabled their beneficiaries to sell their personal and investment property.

188.    WHEREFORE, Aetna is liable to Lambert for the sum not less than $1,614,000 in

equitable restitution.

**COUNT VII:**
**EQUITABLE RESTITUTION - NEGLIGENT TAX REPORTING**
**Under ERISA § 503(a)(3)**
**(Made-Whole Relief)**

189.    All prior paragraphs are incorporated into this count.

190.    Under the terms of the Plan and relevant Internal Revenue Code provisions, the

benefits payable to Lambert were not subject to federal personal income tax if Lambert

were an equity owner above 2% (i.e. as co-owner, insurance premiums were taxable

compensation to Lambert, but any benefits received were not taxable personal income).

191.    In 2013, Flightlookup's corporate records showed that Lambert was an equity owner

of not less than 17%. The other major shareholders freely acknowledge that Lambert was

an equity owner.

192.    In 2014 and various times thereafter, Aetna's records acknowledged that Lambert was

an equity owner.

193.    However, in 2014 and later, Aetna instead reported that Lambert was a non-equity

employee and reported his income to the IRS as taxable personal income—but as an

independent contractor. Aetna informed Lambert of this unusual tax treatment.

194.    As a direct result of this, on April 20, 2020, the IRS assessed significant tax back

taxes, penalties, and interest totalling $24,752.78 against Lambert for the 2014 tax

year—a period when Aetna had deemed Lambert "totally disabled."

195.    On January 31, 2023, the IRS filed a statutory tax lien against Lambert's personal

residence, resulting from income from the 2014 and 2017 tax years. Other tax similar

resulting tax debts were also newly discovered in April 2020, but that information will be available until a future date.

196.    If Aetna correctly treated Lambert as an equity owner, as Aetna's records originally noted, then Lambert's tax liability for disability payments would have been $0.

197.    In 2019, when Lambert complained to Aetna of the tax treatment, Aetna claimed that Lambert was ***not*** an equity owner of his company in 2019.

198.    But for Aetna's mistake and refusal to correct a simple mistake in paperwork that would have cost Aetna nothing, Lambert would not be indebted by law to the IRS relating to the disability benefits nor would his home have a tax lien upon it.

199.    As a fiduciary in breach of its fiduciary responsibility to a beneficiary, Aetna should bear the expense of misreporting Lambert's income and for attempting to conceal its breach of the Plan and its resulting tax reporting error.

200.    WHEREFORE, Aetna is liable to Lambert for equitable restitution in the sum of not less than $29,561.59, plus interest, and to be determined more specifically based upon records not in Lambert's possession.

## **REQUESTED RELIEF**

Plaintiff George Lambert requests a judgment against the Plan and its administrator in the following amounts:

1.    Back pay, from denied benefits, in the amount of $303,333;

2.    Back pay, from underpayments, in the amount of $48,125;

3.    Front pay in the amount of $846,000;

4.    Statutory penalties in an amount of up to $92,180;

5.    Equitable restitution in an amount not less than $1,607,115;

6.  Equitable restitution in an amount not less than $29,561.59;

7.  Prejudgment and postjudgment interest at the applicable federal judgment rates;

8.  Reasonable attorney's fees and costs as provided by 29 U.S.C. § 1132(g)(1).

Respectfully submitted,

George Lambert

By his attorney:

Date: April 6, 2023

_/s/ David. S. Osterman_____
David S. Osterman
NH Bar No. 1939
66 Hanover Street, Suite 200
Manchester, NH 03101
(603) 626-5452
email@dsostermanlaw.com